Argued February 20, reversed April 28, reconsideration denied
May 28, petition for review denied June 24, 1975

# PACIFIC NORTHWEST BELL TELEPHONE
COMPANY (No. 81789), *Respondent, v.*
SABIN, *Appellant.*

534 P2d 984

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Lee Johnson, Attorney General, W. Michael Gillette, Solicitor General, John H. Socolofsky, Assistant Attorney General and Counsel, and Alvin L. Alexanderson, Assistant Attorney General, Salem.

*Richard Devers,* Portland, argued the cause and filed the brief for respondent. With him on the brief were Cleveland C. Cory, Davies, Biggs, Strayer, Stoel and Boley; and Lloyd G. Hammel, Jr., Portland.

Before SCHWAB, Chief Judge, and LANGTRY and FORT, Judges.

LANGTRY, J.

Pursuant to ORS 756.610 Oregon's Public Utility Commissioner (hereafter "Commissioner") appeals from a decree of the circuit court directing the entry of an order which would have the effect of increasing the annual intrastate revenues of Pacific Northwest

Bell Telephone Company (hereafter "PNB") in an amount previously determined by him to be excessive.

Public utilities[1] operating in this state are required to provide the Commissioner with schedules showing "all rates, tolls and charges" in force for services performed, as well as all "rules and regulations that in any manner affect the rates charged or to be charged * * *."[2] Any increase in rates must be preceded by the submission of "revised schedules," and is dependent upon a showing by the utility that the proposed rates are "just and reasonable."[3]

On September 15, 1972 PNB filed revised rate schedules designed to increase its annual intrastate

---

[1] "(1) As used in this chapter, except as provided in subsection (2) of this section, the term 'public utility' means:

"(a) Any corporation, company * * * that owns, operates, manages or controls all or a part of any plant or equipment in this state for the conveyance of telegraph or telephone messages, with or without wires * * * whether or not such plant or equipment or part thereof is wholly within any town or city.

"* * * * *

"(2) As used in this chapter, the term 'public utility' does not include:

"* * * * *

"(e) Any telephone or telegraph corporation not providing intrastate telephone or telegraph service to the public in this state, whether or not such corporation has an office in this state or has an affiliated interest with a public utility as defined in this chapter.

"* * * * *." ORS 757.005.

[2] ORS 757.205.

[3] "Whenever any public utility files with the commissioner any rate or schedule of rates stating or establishing a new rate or schedule of rates or increasing an existing rate or schedule of rates, the commissioner may, either upon written complaint or upon his own initiative, after reasonable notice, conduct a hearing to determine the propriety and reasonableness of such rate or schedule. At such hearing the utility shall bear the burden of showing that the rate or schedule of rates proposed to be established or increased or changed is just and reasonable." ORS 757.210.

revenues by approximately $31.8 million. Following notice to all interested parties and the general public, hearings, which ultimately consumed some 40 days during the period of October 1972 to April 1973, were commenced by the Commissioner. Representatives of both PNB and the Commissioner's own staff were—through these hearings—provided with an opportunity to introduce evidence upon: (a) the value of PNB's property used and useful in the rendition of intrastate service, i.e., its "rate base"; (b) its annual gross operating revenues; (c) its annual operating expenses and costs; and (d) an appropriate "rate of return." Consistent with orthodox rate-making procedures, these various figures would in turn be relied upon by the Commissioner to decide whether and to what extent the proposed increase in rates and charges ought to be granted.[4]

At the conclusion of these hearings, the Commissioner made several "uncontested" findings of fact, including these:

> "PNB is one of 24 telephone operating companies in what is known as the Bell System. American Telephone and Telegraph Company (American) is the parent company and an affiliated interest. Other principal entities of the Bell System include Western Electric Company, Inc. (Western) and Bell Telephone Laboratories, Inc. (Bell Labs).
>
> "PNB has one class of common stock of which 89.2% is owned by American * * *.

---

[4] By comparing the gross operating revenues found to have been earned during the designated "test" period to the sum of (1) the utility's costs and expenses for that period, and (2) the product of the rate base multiplied by the rate of return, the Commissioner is able to determine whether, in fact, the rates presently in effect permit the utility to meet its revenue requirements. For a complete discussion of the elements of rate making see 1 Priest, Principles of Public Utility Regulation 45-226, chs 3-5 (1969).

"* * * * *

"Western is wholly owned by American. It manufactures, purchases, repairs and distributes apparatus, equipment and supplies, and installs central office equipment for the Bell System under separate contracts with the Bell System operating companies. Bell Labs is jointly owned by American and Western. It performs research, development and design work for the Bell System.

"* * * * *

"For many years, a Standard Supply Contract has existed between Western and PNB, providing for the purchase by PNB of telephone equipment, material and supplies from Western. Western manufactures, purchases, repairs, distributes, and scraps telephonic and electronic apparatus, equipment and supplies, and installs central office equipment for Bell System companies, under the terms of the Standard Supply Contract.

"Western has 20 major manufacturing plants and 40 service centers at locations where service to Bell System companies can be provided. In 1971, Western purchased for Bell System companies from about 50,000 suppliers. The purchases exceeded $2.6 billion. Of the purchases, $18 million were made in the State of Oregon. Western's sales account for 80% or more of the domestic market in telecommunications products.

"* * * * *

"[According to a price survey conducted by American the operating companies benefit from significant price advantages in nearly all kinds of equipment and supplies provided by Western.] Western's average earnings over the period of 1946-1971 of 9.3% were also compared to average earnings of 12.1% for 50 large manufacturers and 11.9% for Moody's 125 industrials.

"Western has developed what it terms a volatility index for Western sales [which it compared]

with such an index developed for 50 large manufacturers and * * * for the Bell System operating revenues. [This] study [was] based on dollar volume of sales or revenues (Bell companies) for the years 1946 through 1971 and the percent deviation from trend [was] determined for each year to come up with an average annual deviation of 10.8% (volatility index) in sales of Western to 4.5% in revenues for Bell System companies. Western's volatility index [was] about 25th in the volatility ranking of the 50 manufacturers.

"Western also [demonstrated] that, while Bell System revenues have been increasing yearly within a rather narrow range of variation, its construction expenditures, hence Western's sales vary within a much wider .range of both increases and decreases. Average profit per dollar sales for the years 1946-1971 shows 5.0 cents for Western, 5.9 cents for the 50 largest manufacturers, and 6.3 cents for Moody's 125 industrials."

Taking note of the unique relationship shared by American Telephone and Telegraph Company (hereafter "American"), PNB and Western—as well as the disproportionate market power enjoyed by these corporate entities as a result of that relationship—the Commissioner proceeded to reject the view that this evidence was sufficient to show that either Western's earnings or PNB's payments under the Standard Supply Contract were "fair and reasonable," concluding:

"* * * Even if it were shown that PNB could not have benefitted [sic] by dealing with other suppliers in any of its transactions, the fairness of Western-PNB transactions can only be determined by considering the level of Western's earnings.

"The appropriate level of earnings cannot be determined by a comparison to other manufacturers because other manufacturers are not compar-

able to Western. Western's earnings must be viewed as earnings on an investment in the manufacturing and supply arm of the Bell System, the function of which is to provide utility service. Oregon ratepayers should not be required to pay rates which yield a greater return on the assets of (or investment in) one part of the Bell System than on another simply because the assets are employed in a function undertaken by a non-jurisdictional arm of the system rather than by PNB.

"In each year, 1946 to 1972, Western has achieved a return on its investment devoted to Bell business in excess of the rate of return earned by PNB and authorized by the Commissioner, with the exception of 1946 in which Western's return was less. These earnings will be referred to as 'excess earnings.' PNB's rate base and test year expenses are overstated by the undepreciated amount of higher prices charged by Western to PNB in order to produce PNB's contribution to the excess earnings.

"* * * To the extent that its proposed revenue increase is based on transactions between PNB and Western which yield to Western a greater return than enjoyed by or allowed to PNB, the company has not shown that such increase is fair and reasonable."

On July 14, 1973 the Commissioner issued Order No. 73-447 authorizing PNB to file tariffs increasing its revenues by approximately $18.9 million—an increase some $12.9 million less than that requested. This difference resulted from a number of disallowances in PNB's estimated operating expenses, and adjustments to its rate base as well as the adoption by the Commissioner of a lower rate of return than that proposed by the utility. Included among these disallowances and adjustments were reductions in operating expenses of $207,181 and in the rate base of $2,296,351 attributed to the "excess earnings" of West-

ern. At the rate of return approved (8.93 percent) these specific disallowances and adjustments accounted for approximately $653,000 of the $12.9 million difference between the increase sought by PNB and that found to be necessary by the Commissioner.

Subsequent to the entry of this order PNB initiated an action in the Circuit Court for Marion County in which *only* those disallowances and adjustments based on Western's "excess earnings" were challenged. In addition to alleging that the findings and conclusions of the Commissioner noted above were "legally erroneous, arbitrary, unjust, unreasonable, [and] not supported by substantial evidence * * *," the complaint included the suggestion that prior approval of the Standard Supply Contract[5] as well as the utility's

---

[5] "* * * * *

"(2) *No public utility doing business in this state shall enter into any contract, oral or written, with any person or corporation having an affiliated interest relating to the* construction, operation, maintenance, leasing or use of the *property of such public utility in Oregon, or the purchase of property, materials or supplies, which shall be recognized as the basis of an operating expense or capital expenditure in any rate valuation or any other hearing or proceeding, unless and until such proposed contract has been submitted to and approved by the commissioner.*

"(3) *When any such proposed contract has been submitted to the commissioner he promptly shall examine and investigate it. If, after such investigation, he determines that it is fair and reasonable and not contrary to the public interest, he shall enter his findings and order to this effect and serve a copy thereof upon the public utility, whereupon the contract may lawfully be recognized for the purposes entered into.* If, after such investigation, he determines that the contract is not fair and reasonable in all its terms and is contrary to the public interest, he shall enter his findings and order accordingly and serve a copy thereof upon the public utility, and it shall be unlawful to recognize the contract for the purposes specified in this section." ORS 757.495. (Emphasis supplied.)

"As used in subsection (1) of ORS 757.105 and in ORS 757.495, 'affiliated interest' with a public utility means:
"* * * * *

annual budgets⑥ ought to have estopped the Commissioner from denying the reasonableness of prices paid Western and from disallowing any portion of those payments for purposes of calculating "just and reasonable" rates. Absent from the pleading, however, was any suggestion that the challenged adjustments and disallowances had led to the imposition of rates which would result in the taking of PNB's property for public use without just compensation. (It was conceded by PNB in its argument to this court that the rates authorized by the Commissioner in Order No.

---

"(3) Every corporation five percent or more of whose voting securities are owned by any person or corporation owning five percent or more of the voting securities of such public utility or by any person or corporation in any chain of successive ownership of five percent or more of voting securities of such public utility.

"* * * * *." ORS 757.015.

⑥ "(1) The commissioner has the right and power of regulation, restriction and control over the budgets of expenditures of public utilities, as to all items covering:

"(a) Proposed payment of salaries of executive officers;

"(b) Donations;

"(c) Political contributions and political advertising;

"(d) Expenditures for pensions or for a trust to provide pensions for employes and officers;

"(e) Other expenditures and major contracts for the sale or purchase of equipment; and

"(f) Any payment or contemplated payment to any person or corporation having an affiliated interest for service, advice, auditing, associating, sponsoring, engineering, managing, operating, financing, legal or other services.

"(2) On or before November 1 of each year each public utility shall prepare a budget showing the amount of money which, in its judgment, shall be needed during the ensuing year for covering all such activities and expenditures, and file it with the commissioner.

"(3) When any such budget has been filed with the commissioner he shall examine into and investigate the same and unless rejected within 60 days thereafter, the proposed budget is presumptively fair and reasonable and not contrary to public interest.

"* * * * *." ORS 757.105.

73-447 *were not* confiscatory, and had not, therefore, been imposed in violation of either Art I, § 18 of the Oregon Constitution or the Fifth and Fourteenth Amendments to the U.S. Constitution.)

After studying briefs submitted by both parties, considering their oral arguments, and reviewing relevant portions of the proceedings before the Commissioner, the court below issued a decree on July 17, 1974 which included these findings of fact and conclusions of law:

"The Court is bound by the findings of the [Commissioner] unless [PNB] carries the burden of showing they are not supported by substantial evidence and that the order is unreasonable or unlawful. This burden requires a showing by clear and convincing evidence.

"The Court finds that Western is clearly an affiliated interest of [PNB]. The public utility law of Oregon does not subject Western Electric to the authority of [Commissioner] to establish its rate of return. [PNB], however, must bear the burden of showing that Western's rate of return is reasonable.

"\* \* \* \* \*

"The [Commissioner] is free to reject the evidence of [PNB], but his findings that Western is to be held to the same rate of return as [PNB] must be supported by substantial evidence.

"There was not substantial evidence in the rate case record to support a finding that holding Western to the same rate of return as [PNB] is reasonable and fair. There was also no substantial evidence to support a finding that the exposure to risk of Western was the same as that of an investment in [PNB].

"\* \* \* \* \*

"The Court specifically finds that the record does contain substantial evidence to show that the

rate of return to Western is fair and reasonable and not contrary to the public interest.

"* * * * *

"1. ORS 757.490 and 757.495 establish the standards by which the [Commissioner] is to determine the propriety and reasonableness of payments made to an affiliated interest by a public utility for any purchases.

"2. [Commissioner's] disallowance of [PNB's] payments to Western in excess of the rate of return authorized for [PNB] was erroneous under the statutory standards set forth in ORS 757.495(3).

"3. The erroneous finding of [Commissioner] results in an order which is unreasonable and unlawful within the meaning of ORS 756.594.

"4. [PNB] is entitled to an increase in revenue to provide for an 8.93% rate of return on the disallowed investment and to recoup the expenses related to that disallowed investment.

"* * * * *

"6. It is not necessary for [PNB] to claim or establish that the order of [Commissioner] is confiscatory in order to show that it is unreasonable or unlawful.

"7. Because of the foregoing findings and conclusions, it is not necessary for the Court to reach the question of whether the [Commissioner] is estopped from making the disallowance because of his past actions and this question of law is specifically not ruled upon."

On the basis of these findings and conclusions, the case was then remanded to the Commissioner with directions "to make and enter an order * * * increasing [PNB's] rate base and operating expenses in accordance with this opinion and authorizing [PNB] to file rate schedules which will increase its annual intrastate gross revenue in the amount necessary to

provide [PNB] with an 8.93% rate of return in the test year on the disallowed investment and recoup the related expenses."

Because the circuit court misconstrued both the nature of the Commissioner's rate-making authority and the appropriate scope of judicial review in appeals from the exercise of that authority, we are compelled to reverse its decree with directions to affirm the order of the Commissioner.

■ That the regulation of public utilities, including the fixing of rates, constitutes a legislative function is beyond argument. *St. Joseph Stock Yards Co. v. U.S.*, 298 US 38, 56 S Ct 720, 80 L Ed 1033 (1936); *The Minnesota Rate Cases*, 230 US 352, 33 S Ct 729, 57 L Ed 1511, 48 LRA (ns) 1151, 1916A Ann Cas 18 (1913); *Valley & Siletz R.R. Co. v. Flagg*, 195 Or 683, 247 P2d 639 (1952). The powers of a regulatory agency or agent are not, however, without limits. Like the legislature itself, a regulatory agency is bound to exercise its authority within the confines of both the state and federal constitutions. An agency's authority may be further limited by the legislature itself; its power arises from and cannot go beyond that expressly conferred upon it.

■ Oregon's legislature has, since 1931, seen fit to delegate its authority to regulate public utilities to the office of a Public Utility Commissioner charged with the responsibility of representing the patrons of utility service and the public generally "in all controversies respecting rates, valuations, service and all matters of which he has jurisdiction * * *," and of using the powers of his office to protect those patrons and the public "from unjust and unreasonable * * * rates." ORS 756.040. As noted above, utilities seeking to increase rates or charges have the burden of establishing the reasonableness of those rates

to the satisfaction of the Commissioner. ORS 757.210 (*see* n 3). The Commissioner appears, therefore, to have been granted the broadest authority—commensurate with that of the legislature itself—for the exercise of his regulatory function.

Although a party "aggrieved" by a rate-making decision of the Commissioner may commence a "suit in equity" in circuit court (ORS 756.598) to modify, vacate, or set aside the order (ORS 756.580), the legislature has specifically provided that the circuit court may not "substitute its judgment for that of the commissioner as to any finding of fact supported by substantial evidence * * *" (ORS 756.598(1)), and that the "aggrieved party" must show "by clear and satisfactory evidence that the order is unreasonable or unlawful."

■■ The plain import of these statutory provisions is that where a rate order is based upon "substantial evidence" and violates no provision of either the Oregon or Federal Constitution a court is without authority to alter it in any way. They further suggest that where an increase in rates has been rejected because the petitioning utility has failed to meet its burden of providing evidence sufficient to show that expenditures relied upon as a basis for the increase are themselves "reasonable," (where conclusions pro and con are supported by evidence that has substance) the order of the Commissioner must be sustained as both reasonable and lawful.

■ In light of PNB's failure to allege that implementation of the rates actually authorized by the Commissioner would result in the confiscation of its property, the scope of the circuit court's inquiry was properly limited to the questions of (1) whether the challenged disallowances were made in violation of some statutory limitation upon the Commissioner's authority to set rates, and (2) whether the Commis-

sioner's decision to make those disallowances was supported by substantial evidence.

In its brief to this court PNB has argued that:

"The tests by which purchases by a Bell System operating company from Western under the Standard Supply Contract are measured have been laid down by the United States Supreme Court:

"1. Whether Western's prices are as low as those available elsewhere (*City of Houston v. Southwestern Bell Telephone Co.*, 259 US 318, 42 S Ct 486, 66 L Ed 961 (1922), and [2] whether Western's profits are fair and reasonable, when compared with other large manufacturers. *Smith v. Illinois Bell Telephone Co.*, 282 US 133, 51 S Ct 65, 75 L Ed 255 (1930), implemented by the District Court in *Illinois Bell Telephone Co. v. Gilbert,* 3 F Supp 595 (ND Ill 1933)."

Study of the circuit court's decision under review here suggests it was, in fact, based upon the conclusion that the evidence introduced by PNB had conclusively established the reasonableness of its payments to Western for purposes of a rate determination; review of the record makes it equally apparent that this conclusion necessarily resulted from the court's adoption of those "tests" which PNB suggests were established by the Supreme Court in *Smith v. Illinois Bell Tel. Co.*, 282 US 133, 51 S Ct 65, 75 L Ed 255 (1930), and *Houston v. Southwestern Tel. Co.*, 259 US 318, 42 S Ct 486, 66 L Ed 961 (1922).

Unlike the circuit court, however, we do not read these cases as creating exclusive standards for the evaluation of affiliated transactions in the context of a rate determination proceeding. *Houston* involved cross-appeals in a suit to restrain the enforcement of an ordinance enacted by the city prescribing rates for telephone service, *based upon the claim that the rates*

*were confiscatory.* The district court found that the rates were, in fact, unlawful and enjoined the enforcement of the ordinance. Agreeing that a clear preponderance of the evidence compelled a finding that the ordinance rate was confiscatory, the Supreme Court affirmed the decree of the district court. Because the court thought it probable, however, that there would be further controversy as to what were "reasonable rates" as well as to what the legal basis ought to be for determining the value of the utility's property, it went on—in what its opinion acknowledged was dicta —to consider several of the arguments raised by the parties.

The city (regulator) had attempted to gain a dismissal of the case because Southwestern Bell had failed to disclose the profits of Western and American. In response to these contentions the district court had said:

> "The scope of the inquiry in this case cannot be extended to the determination of a fair rate of profit * * * to the Western Electric Company * * *." *Southwestern Tel. & Tel. Co. v. City of Houston,* 268 F 878, 885 (SD Tex 1920).

The Supreme Court specifically noted that rate making in the absence of information on an affiliate's costs and profits was permissible, saying:

> "It is true that the Company did not introduce proof to show what the profits of the two companies were, either upon the business done with it or on their entire business, but it did introduce much evidence tending to show that the charge made and allowed for the services rendered and supplies furnished by them was reasonable and less than the same could be obtained for from other sources. Under the circumstances disclosed in the evidence, the fact that the American Telegraph & Telephone Company controlled the Company and the Western Electric Company by stock owner-

ship is not important beyond requiring close scrutiny of their dealings to prevent imposition upon the community served by the Company, but the court recognized and applied this rule * * *." 259 US at 323.

If, in fact, this language might at one time have been relied upon in support of the view that the reasonableness of payments to an affiliate might be established solely by evidence that the prices charged by the affiliate were "competitive," it lost any such significance when in *Smith* similar evidence was rejected as inadequate.

*Smith* itself arose from an order of the Illinois Commerce Commission requiring Illinois Bell Telephone to *lower* certain telephone rates in the city of Chicago. Illinois Bell obtained an injunction in district court forbidding the enforcement of the order on the ground that it would have a confiscatory effect; both the Illinois Commission and the city of Chicago appealed to the Supreme Court. The commission's order had resulted from a number of disallowances in the rate base and operating expenses of the utility. Although no specific finding as to the "fairness" of the prices paid Western had been made in the course of the administrative proceeding, the city had argued in district court that they had been "exorbitant." The district court found this claim to be unsupported by the record, pointing out that Western's average profits on its total business had consistently been "reasonable." Rejecting the notion that a showing of "reasonable profits" would be adequate to establish the fairness of Western's dealing with its affiliated utilities, the Supreme Court held:

"* * * The Western Electric Company not only manufactured apparatus for the licensees of the Bell system but engaged in other large operations and it cannot be merely assumed or conjec-

tured that the net earnings on the entire business represent the net earnings from the sales to the Bell licensees generally or from those to the Illinois Company. Nor is the argument of the appellants [that the prices paid Western by Illinois Bell had been exorbitant] answered by a mere comparison of the prices charged by the Western Electric Company to the Illinois Company with the higher prices charged by other manufacturers for comparable material, or by the Western Electric Company to independent telephone companies. The point of the appellants' contention is that the Western Electric Company, through the organization and control of the American Company, occupied a special position with particular advantages in relation to the manufacture and sale of equipment to the licensees of the Bell system, including the Illinois Company, that is, that it was virtually the manufacturing department for that system, and the question is as to the net earnings of the Western Electric Company realized in that department and the extent to which, if at all, such profit figures in the estimates upon which the charge of confiscation is predicated. We think that there should be findings upon this point." 282 US at 152-53.

Admitting that this passage might easily be "subject to misunderstanding," at bar PNB asserts that *Smith* stands for the proposition that where Western's profits with its Bell affiliates—rather than its total profits—are shown to be comparable to "manufacturers' profits" they—and the payments from the affiliates to Western—should be presumed to be "reasonable." Subsequent decisions lend little support to this interpretation, however, tending rather to buttress the Commissioner's argument that *Smith* stands simply for the proposition that

"* * * in a rate case involving a Bell operating company which purchases telecommunications equipment from Western, it is permissible (and

perhaps even mandatory) for a regulatory commission to inquire into Western's net earnings on its transactions with that Bell operating company. [The decision] does not prescribe the manner in which the inquiry must be made, or the standard against which Western's earnings may be measured."

In 1964 Pacific Telephone and Telegraph Company appealed to the California Supreme Court from a rate order of the Public Utilities Commission, challenging various disallowances of amounts ·it had sought to have included in its rate base and expenses, including deductions from payments made to Western for equipment and supplies. *Pacific Tel. & Tel. Co. v. Public Util. Com.*, 62 Cal 2d 634, 44 Cal Rptr 1, 401 P2d 353 (1965). Noting that the utility had, in fact, introduced much evidence tending to show that Western's prices were less than those charged by other manufacturers and that the profits made by Western on manufactured items were less than the average profits enjoyed by the most nearly comparable competitors, the court went on to quote extensively from the commission's decision setting out the rationale behind the "Western adjustments."[7] Rejecting the util-

---

[7] "The commission states in its decision that Pacific, after establishing the inherent advantages of a single large market supplied by a single large supplier of telephone material and services, compared Western's prices with those of the 'much smaller non-Bell market of more than 90 manufacturers and suppliers for some similar equipment. Comparability of manufacturers and suppliers was not established and the reasonableness of other company prices, even assuming comparability, was not demonstrated. Moreover, the massive and unique market enjoyed by the non-operating segments of American in the purchases by operating segments provides an advantage so great in volume alone in each of the fields of manufacturing, installation, purchasing and distribution that competition is effectively eliminated. Western has a stable, assured and captive market. * * * We find [continues the commission] that

ity's contention that its evidence compelled a finding that the full amount of its payments to Western should have been included in its rate base and expenses as

little, if any, weight can be accorded such price comparisons in judging the reasonableness of Western's prices. It is the cost to Western that is significant.'

"Further, according to the decision of the commission, Pacific 'attempted to justify the earnings of Western, that resulted from the prices for telephone material that the Bell System determined that the Bell System should pay, by a comparison . . . of various financial ratios over the years 1946-1961 for Western and for 47 selected utility suppliers (15 gas, 15 electric and 17 telephone).' However, states the commission, Pacific's 'showing in this respect completely disregards the affiliation of Western with the Bell System and the unique conditions under which Western operates, is devoid of valid comparisons, and, even assuming comparability, does not demonstrate the reasonableness of earnings of the other companies. The advantage that the Bell System has in its integrated position of being researcher, designer, engineer, manufacturer, distributor, installer, repairer, junker and . . . operator of 80 percent of the telephone business in the entire continental United States makes it impossible to compare one phase of its operations, that of Western Electric, with outside companies who have none of the same spread of operations and control either in utility business or with respect to any business within which the outside companies operate. Western, in its relationship to [Pacific] and other operating subsidiaries of the Bell System, is not at all comparable to an independent manufacturing concern.'

"Additionally, 'As a matter of policy [Pacific] over the years has required that it [Western] provide the equipment and instrumentalities used . . . . The result of such a policy has been effectively to prohibit entry of any competitive instruments into the telephone market in [Pacific's] territory. Accordingly, practically all items of communication equipment on customer premises served by [Pacific] are manufactured by Western. In those few instances where Western is not the manufacturer, the instruments are subject to prior approval and acceptance by Western. Moreover, because of the close affiliated relationship between [Pacific] and Western, [Pacific's] policy results in a substantial reduction in risk since both [Pacific] and Western have the opportunity for complete control of what instruments will be offered for public use and the degree of obsolescence

"reasonable" expenditures, the court affirmed the decision of the commission, concluding that:

> "* * * Pacific did not, and apparently could not, present convincing comparisons between the prices of Western and those of other manufacturers, or other evidence, which would establish beyond question the reasonableness for rate fixing of prices paid by Pacific to Western, its controlled affiliate. Cases cited by Pacific involved other records and other findings in other contexts, and of course do not suggest that a utility is entitled to favorable findings as a matter of right in the absence of undisputed evidence on the point. The determination of the commission in the present case that Western is entitled to no greater return on its sales to Pacific than Pacific is entitled to earn on its operations, and that American should not be permitted through the corporate instrument of Western to subject Pacific's ratepayers to the burden of providing a greater return, is based not only on extensive findings made by the commission on the subject but also on the methods and principle theretofore followed by the commission (see Decision No. 56652, 56 Cal. P.U.C. 277, 282, in which in 1958 the commission authorized an increase in the rates of Pacific), and as the commission expressly found herein, produces a fair and reasonable result." 62 Cal 2d at 661-62.

In Pacific Telephone and Telegraph Company's next rate case the California Public Utilities Commission declined to make its "Western adjustments" on the basis that Western had been efficiently operated, had received a return on net equity comparable to that enjoyed by "ordinary" manufacturers, and had charged lower prices for manufactured products than

---

that they assign to the instruments that are now in [Pacific's] operating plant.'" (Brackets theirs.) Pacific Tel. & Tel. Co. v. Public Util. Com., 62 Cal2d 634, 660-61, 44 Cal Rptr 1, 401 P2d 353 (1965).

did other producers of similar products. In reversing the order of the commission with directions to reinstate the adjustments, the California Supreme Court held:

"* * * [W]here it appears that a utility enjoys the dominant position shown by the commission's findings, it may not through the use of corporate instrumentalities obtain a greater rate of return than the utility would be entitled to in the absence of the separate corporate entities, and it was not determinative whether the prices charged by one affiliated corporation to another might be considered reasonable. In other words, the utility enterprise must be viewed as a whole without regard to the separate corporate entities, and the rate of return should be the same for the entire utility enterprise.

"* * * A corporation should not be permitted to break up the utility enterprise by the use of affiliated corporations and thereby obtain an increased rate of return for its activities. In the light of the dominance of the Bell System and its integrated position, we again reject the view that a finding of the reasonableness or prudence of Pacific's purchases from Western would warrant termination of the Western Electric adjustment.

"There has been no substantial change since our prior decision as to the dominance of the Bell System or as to the relationship between Pacific, American, and Western. Accordingly, Western must be considered part of the utility enterprise, and its prices should be adjusted to reflect no greater rate of return on its sales to Pacific than Pacific is entitled to earn on its operations. This result cannot be avoided on the basis of a finding that Western's prices were reasonable when compared to other manufacturing enterprises." *City of Los Angeles v. Public Utilities Commission,* 7 Cal 3d 331, 344, 102 Cal Rptr 313, 497 P2d 785 (1972).

In 1973 several parties—including the "Independent Voters of Illinois"—appealed from a trial court order affirming an order of the Illinois Commerce Commission fixing rates for Illinois Bell Telephone Company (the same utility involved in *Smith*). The utility had filed a proposed tariff schedule which would have increased its annual operating revenues by $182,000,000; after extended hearings a general rate increase in the amount of $44,562,000 had been granted. The Supreme Court of Illinois issued an opinion which read in relevant part:

"IVI [Independent Voters of Illinois] contends that because Western Electric and Bell are both subsidiaries of and dominated by AT&T, Bell should not be permitted to include as operating expenses any sums paid to Western in excess of the amount required to give Western the same 7.33% rate of return allowed Bell. It argues that AT&T, 'through the corporate device of the Western Electric Company' realizes a profit from its sale to Bell which in turn capitalizes the purchases, or charges them to operating expense, 'thus subjecting Bell's rate payer to the burden of paying a profit on a profit.' It is Bell's position that the evidence shows that Western's prices and profits are lower than any comparable source of the equipment it manufacturers [sic] * * *.

"The record shows that AT&T owns 99.3% of the shares of Bell and 100% of the shares of Western. As previously noted, Bell's testimony concerning its financial structure and requirements for a reasonable rate of return show it to be virtually inseparable from AT&T, and we deem it improper to permit AT&T, through sales by Western to Bell, to earn 10.4% on that portion of its operations when the Commission has found 7.33% to be the appropriate rate of return. In our opinion, to do so imposes on Bell's patrons the burden of providing to AT&T, through the device described, an excessive return on the sales by West-

ern to Bell, and we hold that it was error to recognize with respect to both the fair value rate base, and operating expenses, any sums paid by Bell to Western which would yield Western a return in excess of 7.33%." *Ill. Bell Tel. Co. v. Comm. Com.,* 55 Ill 2d 461, 483-84, 303 NE2d 364 (1973).

These decisions[9] are, quite obviously, in conflict with the view that *Smith* and its progeny gave rise to the rule that market prices and comparative returns must be accepted by a regulatory agency as the standards for testing the reasonableness of payments made to an affiliate. In none of these cases has an appeal been attempted by the utility.

 We are satisfied that where, as in Oregon, a regulatory agent has been granted broad legislative authority he is not obligated to employ any single formula or combination of formulas to determine what are in each case "just and reasonable" rates. Where uncontested evidence discloses (1) that a utility has purchased the bulk of its necessary equipment and supplies from an "affiliated" manufacturer, and (2) that due to the affiliated relationship the manufacturer enjoys a unique position of market power which renders a comparison of its prices and profits with those of "peripheral" manufacturers inadequate as a measure of the "reasonableness" of the utility's payments to it, the failure by the utility to provide additional evidence as to their reasonableness may be relied upon by the Commissioner as a basis for disallowing from the utility's rate base and operating expenses those portions of the utility's payments which represent a return to the manufacturer greater than that allowed the utility itself. So long as disallowances of this nature neither violate any specific statutory limits upon the Commissioner's otherwise plenary rate-making

[9] *See also:* Matter of General Tel. Co. v. Lundy, 17 NY2d 373, 271 NYS2d 216, 218 NE2d 274 (1966).

power nor result in the imposition of rates which produce a taking of private property without just compensation, they will be upheld as both reasonable and lawful.

██ ██ Application of this rule to the case at hand requires us to decide a final question explicitly avoided by the circuit court. Does the Commissioner's prior approval of a contract between a utility and an affiliated interest (ORS 757.495) or of the utility's annual budgets which include payments under that contract (ORS 757.105) "estop" him from disallowing any portion of those payments when exercising his authority to determine and impose "just and reasonable" rates?

As noted at the outset, rate making is a legislative function, and those upon whom responsibility for the exercise of that function is conferred are endowed with a broad discretion. Professor Davis has pointed out that:

> "* * * For an equity court to hold a case so as to take such further action as evolving facts may require is familiar judicial practice, and administrative agencies necessarily are empowered to do likewise. When the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances, irrespective of its past decisions. * * * Even when conditions remain the same, the administrative understanding of those conditions may change, and the agency must be free to act * * *." (Footnotes omitted.) 2 Davis, Administrative Law Treatise 605, 610, § 18.09 (1958).

Because applying a doctrine of "estoppel" to the acts of the Public Utility Commissioner would deprive him of an essential flexibility and appear to be inconsist-

ent with his regulatory role, we do not believe that either ORS 757.495 or 757.105 should—in the absence of clear language to the contrary—be interpreted as giving rise to such a limitation.

Prior to the enactment of "affiliated interest" and annual budget statutes, a regulatory agency's ability to monitor dealings between affiliated corporations was limited to the actual rate determination process itself. "Excessive payments" previously made to an affiliate would—in order to protect ratepayers—be disallowed from the utility's rate base and/or operating expenses. Many state legislatures—including Oregon's—were not satisfied, however, that this indirect control was adequate to protect the consumer *and* the investor from the potential abuses arising from an affiliated relationship. ORS 757.495 and 757.105 are products of that concern and represent an *extension* of the Commissioner's authority; they do not in any way limit his ability to exercise the full range of his discretion—within constitutional limits—when called upon to determine what is at a given time a "just and reasonable rate."

As noted in *Matter of General Tel. Co. v. Lundy,* 17 NY2d 373, 380, 271 NYS2d 216, 218 NE2d 274 (1966):

> "So far as rate making is concerned, it is of no consequence that the Legislature has declined to go further and provide for regulation by the commission of the very terms and conditions of all contracts between affiliates. The primary purpose of such regulation is to protect the corporation's treasury and to preserve its financial integrity. The function of the rate-making power, however, is to protect the utility's rate payers. In the proper exercise of that power, the commission does not require the authority to invalidate contracts. All that is required—and, indeed, all that is given—

is the authority to disregard unwarranted payments to affiliates when calculating the 'just and reasonable' rates which the telephone company will be permitted to charge to its subscribers. The treatment thereby accorded to the affiliates' overcharges is no different than in any other case 'where the commission and management disagree on the reasonableness of an expenditure, and the management concludes that it is good business judgment to make such payments from its profits despite the fact that it cannot recoup them from its rate payers'. (*Pacific Tel. & Tel. Co. v. Public Utilities Comm.*, 34 Cal. 2d 822, 832, *supra;* see *New Jersey Bell Tel. Co. v. Board of Pub. Utility Comrs.*, 12 N. J. 568, 592, *supra;* cf. *Southwestern Elec. Power Co. v. Federal Power Comm.*, 304 F. 2d 29, 47, cert. den. 371 U. S. 924.)" (Footnote omitted.)

While holding that the Commissioner had exceeded his authority in excluding certain expenditures *from the utility's budget* under authority of the predecessor of ORS 757.105, the Supreme Court pointed out in *Pacific Tel. & Tel. Co. v. Flagg,* 189 Or 370, 220 P2d 522 (1950), that the "allowance" of a budget item would not affect in any way the Commissioner's authority in a subsequent rate determination case:

"* * * A determination by him does not estop him from later reopening the question and making a different determination based upon fuller information. And, as the court said in *Pacific Telephone and Telegraph Co. v. Public Utilities Commission,* (Cal.) 215 P. (2d) 441 (decided February 28, 1950), 'in fixing Pacific's rates the commission may disallow expenditures that it finds unreasonable, thus insuring that any excessive costs will be met from Pacific's profits.' " 189 Or at 392.

Further, where, as here, the Commissioner has approved a contract without knowledge of the prices

to be imposed by the affiliate® and has given approval to a budget without knowledge of the return value to be gained by the expenditures included therein, neither act should be available as a bar to the full exercise of his rate-making authority. The prior approvals of the Commissioner can at best be characterized as a validation of a continuing course of conduct which—at the time—lacked the appearance of impropriety or unreasonableness; subsequent scrutiny of that course of conduct for the purposes of calculating a rate which is just and reasonable to both the utility and its patrons should not be limited in any way by those decisions.

Because PNB failed to produce evidence sufficient to meet its burden of proving that payments to Western had, in fact, been "reasonable," the disallowances in operating expenses and adjustments to rate base ordered by the Commissioner were both supported by substantial evidence and within the scope of his statutory authority.

Reversed.

---

® Relevant provisions of the Standard Supply Contract, Western Electric Company, Incorporated and Pacific Northwest Bell Telephone Company, dated July 1, 1961, provide:
"ARTICLE II
"PRICES AND TERMS.
"1. General.
"The Electric Company's prices and terms shall be as low as to its most favored customers for like materials and services under comparable conditions.
"2. Materials, Equipment Specifications and Installations.
"The prices to be paid by the Telephone Company to the Electric Company for materials, equipment specifications and installations shall be those established from time to time by the Electric Company. Such prices in so far as practicable and any conditions affecting them not specifically provided for in this Article shall be included in the Electric Company's published price lists. Prices for materials shall include inspection provided for in paragraph 3 Article 1 of this Agreement.
"* * * * *."