Argued October 29, 1976, affirmed January 17, reconsideration denied February 16, petition for review denied May 17, 1977

AMERICAN CAN COMPANY et al, *Appellants,*
*v.*
DAVIS, *Respondent,*
PACIFIC POWER & LIGHT COMPANY,
*Intervenor-Respondent.*
(No. 87,551, CA 5283)

CROWN ZELLERBACH CORPORATION,
*Appellant,*
*v.*
DAVIS, *Respondent,*
PACIFIC POWER & LIGHT COMPANY,
*Intervenor-Respondent.*
(No. 87,559, CA 5284)

OLIVER, *Appellant,*
*v.*
SABIN, *Respondent.*
(No. 88,519, CA 5291)

CITY OF PORTLAND, *Appellant,*
*v.*
DAVIS, *Respondent,*
PACIFIC POWER & LIGHT COMPANY,
*Intervenor-Respondent.*
(No. 89,073, CA 5292)
(Consolidated cases)
559 P2d 898

[ 208-a ]

Allan Hart, Portland, argued the cause for appel-

lant American Can Company et al. With him on the briefs were Lindsay, Nahstoll, Hart & Krause, Portland.

Richard Devers, Portland, argued the cause for appellant Crown Zellerbach Corporation. With him on the briefs were E. Joseph Dean and Davies, Biggs, Strayer, Stoel and Boley, Portland.

E. D. Oliver, Lacomb, filed briefs in propria persona.

Robert C. Irelan, Senior Deputy City Attorney, Portland, argued the cause for appellant City of Portland. With him on the brief was John W. Osburn, City Attorney, Portland.

Al J. Laue, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Gerard K. Drummond, Portland, argued the cause for Intervenor-Respondent. With him on the brief were George D. Rives, Marcus A. Wood and Rives, Bonyhadi & Drummond, Portland.

Before Fort, Presiding Judge, and Tanzer and Richardson, Judges.

FORT, P. J.

## FORT, P. J.

These four cases have been consolidated for trial and appeal. The plaintiffs' appeals are from an order of the circuit court affirming Public Utility Commissioner Order No. 74-658, which revised the rates of Pacific Power & Light Company (Pacific). Pacific appears as an intervenor.

A pretrial order and stipulation set forth the following facts agreed upon by all plaintiffs excluding E. D. Oliver:

"6. On December 27, 1973, Pacific filed with the Commissioner revised tariff schedules applicable to electric service in Oregon. The revised tariff schedules would have increased Pacific's annual gross operating revenues by 23.15% * * *.

"7. In its revised tariffs as filed, *Pacific proposed that all additional revenues* raised by said tariffs, with the exception of Crown Zellerbach's, and other exceptions, minor and not material here, *be obtained by increasing by approximately 2.8 mills the charge per kilowat hour for the energy in each energy block in each existing rate schedule, thereby distributing the revenue increase on the basis of energy consumption.* Crown Zellerbach received an increase larger than 2.8 mills per kilowatt hour.

"8. On January 18, 1974, pursuant to ORS 757.215, the Commissioner suspended Pacific's revised tariffs for six months in order to conduct an investigation and hearing, and on July 27, 1974 the suspension was continued for an additional three months. During the suspension period the Commissioner conducted hearings on the propriety and reasonableness of the revised tariffs. All plaintiffs herein were parties to those proceedings as intervenors and protestants.

"9. On September 3, 1974, the Commissioner entered Order No. 74-658 in said proceedings, (the Order), which permanently suspended the revised tariffs filed by Pacific on December 27, 1973. The Order permitted Pacific to file revised tariff schedules designed to increase its annual gross revenues by 21.61% or $26,617,000 based on the test year 1973 and permitted all of the said additional annual gross revenues (with the

exception of Crown Zellerbach and minor exceptions not material here) to be obtained by increasing the charge per kilowatt hour for the energy in each energy block in each existing rate schedule.

"10. In the Order, the Commissioner found:

" 'Pacific should be permitted to increase its rates to the extent necessary to provide additional annual gross revenues in the amount of $26,617,000, based on the average test year 1973 as herein approved.'
\* \* \*

*Plaintiffs herein do not contest this finding.*

"11. The Order permitted Pacific to increase the average cost of power to industrial customers served on Schedules 32, 37, 48 and Exhibit G as follows:

| | |
|---|---|
| Schedule 32 | 48.7% |
| Schedule 37 | 32.6% |
| Schedule 48 | 55.5% |
| Exhibit G | 35.9% |
| Exhibit G (High Voltage) | 49.5% |

"12. The Order permitted Pacific to apply its revised Schedule 32 rates to Crown, thereby increasing the rates specified in the Contract by about 106.9 percent or, based upon Crown's total 1972 Camas Mill electric bills approximately $1,700,000 annually.

"13. Pacific's Service Area Description defines 'Area P' as 'all territory served by (Pacific) in Multnomah County, Oregon,' and 'Area A' as all territory served by Pacific in Oregon except that territory included in 'Area P' and the territory within and immediately adjacent to the corporate limits of the cities of The Dalles and Springfield.

"14. In the Order, the Commissioner found:

" 'The Area P rates will be discontinued and the Area A rates made applicable in Area P. However, the company may elect to maintain parity of its rates with those of Portland General Electric, but only insofar as the imputed revenue decrease is borne by the shareholders rather than by Pacific's other customers.'

Pursuant to permission contained in the Order, Pacific discontinued its 'Area P' rates by serving all 'Area P' customers at 'Area A' rates.

"15. Pacific has placed in effect the rate increases permitted by the Order and is now, over plaintiffs' protests, charging plaintiffs its revised rates for electric energy and power." (Emphasis supplied.)

Pacific notes that its rates set pursuant to Order 74-658 were superseded on August 13, 1975 by rates imposed by Order 75-704. Thus, this appeal challenges Pacific's tariffs in effect from September 3, 1974, to August 13, 1975.

These actions were brought under ORS 756.580. The challenges by the plaintiffs, either jointly or separately, to the order include the following grounds:

(1) The allocation among customer classes of the burden of Pacific's revenue increase (the rate spread) was unreasonable and discriminatory.

(2) Certain of the Commissioner's findings of fact were not sufficiently specific to enable judicial review.

(3) Certain of the Commissioner's findings of fact were not supported by substantial evidence in the record.

(4) The order permitted Pacific to unilaterally raise rates established by its contract with plaintiff Crown Zellerbach.

(5) The order permitted Pacific to raise its rates in the Portland area to the same level as those it charged elsewhere in Oregon

(6) The Commissioner, as an aid in determining rate spread, did not order and use a study of the cost of service to various customer classes.

The burden of proof is upon the plaintiffs "to show by clear and satisfactory evidence that the order is unreasonable or unlawful." ORS 756.594.

ORS 756.598 provides that court review of the order

"(1) * * * shall be conducted * * * as a suit in equity but the court shall not substitute its judgment for that of the commissioner as to any finding of fact supported by

substantial evidence. The review shall be confined to the record * * *. The court may affirm, modify, reverse or remand the order.

"(2) * * * In the case of a modification or reversal the court shall make special findings of fact based upon evidence in the record and conclusions of law indicating clearly all respects in which the commissioner's order is erroneous."

The court below found the order to be lawful, reasonable and supported by substantial evidence, and decreed that the order be affirmed. Plaintiffs appeal.

We will discuss the issues raised as they are presented in each of the four cases under review.

## I. American Can Company et al v. Davis

The plaintiffs in this action are large industrial customers of Pacific. They challenge the order on the grounds that:

(1) The authorized rate spread is disproportionate and the order does not include findings of fact and conclusions of law sufficient to explain the basis for that spread, and

(2) The authorized rate for industrial customers who generate a portion of their own energy requirements (partial requirements customers) is discriminatory and the order does not include findings of fact and conclusions of law sufficient to explain the basis for that discrimination.

Plaintiffs do not ask this court to determine whether these portions of the order are supported by substantial evidence. They seek a remand to the Commissioner with instructions to make proper findings and conclusions.

### (A) Rate Spread

The order authorized Pacific to raise rates to each customer class by a uniform amount, increasing by 2.8 mills the charge per kilowatt hour for the energy in each energy block in each existing rate schedule. When calculated in terms of increase in *percentage* of

[ 212 ]

rate, as opposed to *amount* per energy block consumed, the increase was: 17.7 per cent for residential customers, 15.9 per cent for commercial, 32.8 per cent for medium industrial, and 58.9 per cent for large industrial.

The Commissioner found:

"The company proposes to increase all rates as heretofore stated by applying a uniform amount per kilowatt hour to all rate blocks of existing schedules. The result is that the increase is distributed among users on the basis of energy consumption.

"The above method of structuring rates has drawn considerable opposition from persons who have electrically heated homes and from commercial and industrial users. Others, including the PUC staff, believe that the company has not gone far enough in this direction.

"Numerous people believe that all rates should be cost-based and that rates should be considerably greater in the higher use areas than they are. This would discourage expanded use of electricity and help lessen the need for some additional generating and transmission facilities.

"* * * * *

"Pacific's rate proposal recognizes the major cost increase components at the present time—the costs of generation and transmission. The proposal would result in high use customers paying a higher percentage of a rate increase than low-use customers. This restructuring does accomplish to some degree a leveling of the rate blocks. * * *"

Specifically, as to industrial rates, the Commissioner found and concluded:

"F. *Industrial Rates*

"Pacific proposes to increase industrial rates in the same manner as other rates—on a per KWH basis for reasons already explained.

"The industrial users (Oregon Committee for Fair Utility Rates) agree that Pacific needs a rate increase. However, the rate increase to be imposed on the industrial customers is said to comprise a disproportionate share of the needed revenue increase. If the proposed

[ 213 ]

increase were approved, it would constitute unjust discrimination and would subject the industrial customer to an unreasonable burden and disadvantage, according to the committee. The spread of rates should be based on the current cost of serving each class of customer unless deviations are warranted by other factors or considerations. The Commissioner concurs with the industrial users that neither a desire to discourage the consumption of electric energy by a class of customers alleged to have an 'elastic demand,' nor a belief that that class of customers can afford a substantial increase, should be factors warranting deviation from the cost guidelines. Discouraging wasteful use is desirable, but there is no indication that industrial users are wasteful, and in any event, the results of this rate order will provide incentive for all customers to eliminate any wasteful usage.

"The industrial users urge that rates can only be equitably apportioned on a fully allocated average cost basis. No such cost study has been made. Therefore, this group of users seeks to show that the 2.8 mills per kilowatt hour charge proposed by Pacific is not all energy charges, nor does it constitute only the additional costs of generating a KW of energy. They make a distinction between fixed and variable costs and assign fixed costs, such as capital costs, to capacity and not to energy. The main difference between the company and the industrial users is the method of assigning costs.

"The industrial users also label as unusual the staff's use of Long Run Incremental Costs. The protestants agree that at present new generating facilities will be added at higher costs than the cost of existing facilities, and therefore LRIC will exceed fully allocated average costs. They argue that since a utility's revenue requirements must be based on its fully allocated average costs, the use of LRIC to determine revenue requirements would produce windfall profits for the utility. Therefore, LRIC is not the 'relevant cost' in establishing the level and design of a utility's rates. It is urged that LRIC can only be used on selected schedules in determining a utility's rate spread and design.

"The various arguments and evidence in support of the two techniques—LRIC and fully allocated cost—do

[ 214 ]

not establish that one is clearly better than the other. There is something to be said for each approach.

"Costs have increased and now additional increases in rates are necessary to recover those costs plus anticipated costs for at least a short period into the future. If rate proceedings are to have any validity for the future, Long Run Incremental Costs must be recognized as guide lines. No windfall will result as contended by the protestants because LRIC does not determine revenue requirements to meet a given rate of return.

"Long run incremental cost studies are a valuable ratemaking tool and will be used where appropriate. They will be used in this proceeding as a guide to how rate increases should be apportioned among the various classes of service up to the revenue requirements found necessary.

"The record supports approval of Pacific's method of distributing the cost increases to the ratepayers and also supports staff's position that the industrial customer is not paying as much of the long run incremental costs as are other classes of ratepayers. Because of the company's proposed method of collecting the revenue requirements, the industrials, as high-use customers, will experience a considerably larger percentage increase in their bills than will other customers. The real question then is, should the industrial rates be further increased above the increases recommended by the company? Since the increase has been primarily necessitated by the higher cost of generation and transmission, and the increased charges have been approved to be applied as energy charges, the answer must be in the negative."

Pacific's vice president, Davenport, testified that "the predominant cause of the company's need for increased revenue is related to the capital and operating costs associated with producing kilowatt-hours." Plaintiffs disputed this assertion. Relying upon Davenport's testimony, Pacific's Exhibit 5, the testimony of their rate expert, Moke, and their Exhibit 35, they argued that only 28.89 per cent of Pacific's 1972-74 cost increases were energy-related and properly recoverable through increased energy charges.

The issue on appeal is whether the Commissioner

resolved the issue raised by this conflict of evidence, and if he did not, as plaintiffs argue, whether he was required to do so.

The regulation of rates is a legislative function of the Commissioner. *Valley & Siletz R. R. Co. v. Flagg,* 195 Or 683, 247 P2d 639 (1952); *Pacific N. W. Bell v. Sabin,* 21 Or App 200, 534 P2d 984, Sup Ct *review denied* (1975). It is "the end result of an order of a regulatory authority which determines the question of its validity and not the processes by which the authority reached the result." *Valley & Siletz* at 699. And the Commissioner "is not obligated to employ any single formula or combination of formulas to determine what are in each case 'just and reasonable' rates." *Pacific N. W. Bell* at 224. Thus the Commissioner has great discretion to determine which of the many possible methods of cost allocation he will utilize in ascertaining a just and reasonable rate spread.

However, rate orders are subject to judicial review, ORS 756.580. In order to facilitate that review, ORS 756.558(2) requires the Commissioner to "prepare and enter findings of fact and conclusions of law upon the evidence received in the matter and * * * make and enter his order thereon. * * *"

The scope of the findings which the Commissioner must enter has been set forth by the Supreme Court in *Valley & Siletz:*

"* * * Since the statute from which we have quoted requires the commissioner to enter findings of fact, and since another statute which we cited provides for judicial review, *the findings ought to set forth sufficient facts so that the reviewing court can prudently discharge its duty and not experience a sense of frustration through inability to get at the facts.* The circumstance that the evidence is in the transcript and that the court, by weighing it, can determine for itself 'the facts' does not suffice. The agency is the fact finder, and *the undigested transcript is not a substitute for a set of findings of fact.* The provisions requiring the commissioner to enter findings and the courts to grant judicial review should afford the

commissioner a dependable chart indicating the scope to which his findings should extend. His knowledge of the issues which the parties presented to him should indicate still further the needed breadth and sweep of his findings. *Leaving an issue of fact in such a state that the agency's reaction to the issue can be discerned only through implication does not suffice: Atchison T. & S.F.R. Co. v. United States,* 295 US 193, 55 S Ct 748, 79 L Ed 1382, and *Panama Refining Co. v. Ryan,* 293 US 388, 55 S Ct 241, 79 L Ed 446; see, also, annotation, 146 ALR 209 at 235. Nor should a court be put in a position wherein it is forced to ferret out the facts or seek them through engaging in mathematical calculations of a kind for which special training is required." (Emphasis supplied.) 195 Or at 711-12. *See also* 712-14.

Proceedings have been remanded to the Commissioner where he had made no direct finding on a basic issue upon which his general finding rested, *Mt. Hood Stages, Inc. v. Hill,* 243 Or 283, 413 P2d 392 (1966), and where findings "merely summarize the evidence of the witnesses produced by the applicant and by the protestants. Nowhere in the order is there any statement by the Commissioner as to what factual conclusions he drew from the evidence." *Bekins Moving & Storage Co. v. P.U.C.,* 19 Or App 762, 768, 529 P2d 413 (1974).

■ We conclude that the Commissioner's findings of fact on the issue of rate spread are sufficient to reveal the basis of his decision.

■ Plaintiffs also contend that the Commissioner ignored another issue raised by the evidence: Which of Pacific's customer classes have more price-elastic demands for energy and which have less price-elastic demands?

PUC staff witness White urged at the hearing that the degree of price elasticity of each customer class be used as a criterion for selecting to what percentage of long-run incremental cost (LRIC) the rates of each class should be raised. According to the evidence, LRIC are estimates of the costs that a utility can expect to

incur over a given future time span for the construction, operation and maintenance of planned additions to its facilities. White contended that industrial customers were more price-sensitive than other classes and should bear a greater portion of a rate increase. Plaintiffs' witnesses disputed that contention.

Rather than ignore this issue, as plaintiffs contend, the Commissioner expressly resolved it by rejecting price elasticity as a relevant criterion for determining rate spread:

"* * * The Commissioner concurs with the industrial users that neither a desire to discourage the consumption of electric energy by a class of customers alleged to have an 'elastic demand,' nor a belief that that class of customers can afford a substantial increase, should be factors warranting deviation from the cost guidelines. Discouraging wasteful use is desirable, but there is no indication that industrial users are wasteful, and in any event, the results of this rate order will provide incentive for all customers to eliminate any wasteful usage."

*See also: Publishers Paper Co. v. Davis,* 28 Or App 189, 559 P2d 891 (1977).

We conclude that this is a sufficient finding of fact.

### (B) Partial Service Requirements Rate

Plaintiffs also challenge the rate increase ordered for partial service requirements customers served on Schedule 47. Evidence submitted by Pacific and by plaintiffs raised the issue of whether partial requirements customers received additional benefits not received by ordinary customers, thereby justifying a higher rate.

The Commissioner found:

"K. Schedules 36 and 47 as proposed by Pacific are approved. The Oregon Committee for Fair Utility Rates takes issue with the partial requirements portion of the tariff. These requirements impose a higher charge upon users who generate electricity in parallel with Pacific. Notwithstanding arguments to the contrary, *the user receives benefit in a more stable power supply by having*

[ 218 ]

*Pacific standing by to pick up the load if the customer's own facilities falter or fail."* (Emphasis supplied.)

Plaintiffs argue that this finding is insufficient because the Commissioner misunderstood the nature of the "standby service" rendered by Pacific to the partial service requirements customers. Such service, according to Pacific's witness Davenport, is a *separate service* for which partial service requirements customers pay a *separate* charge. The plaintiffs argue that a finding that additional benefits, such as improved voltage control and frequency regulation, are rendered was necessary to support this portion of the order. Thus, plaintiffs seek a remand to the Commissioner to enter sufficient findings.

Pacific argues that there is a difference between "standby" and "standing by," that the Commissioner through his expertise knows the difference, that "standing by" means standing by to provide frequency regulation and voltage control, and that these benefits are not reflected in the separate "standby" charge. From our examination of the record, it is clear that substantial evidence was presented to support a finding of these additional benefits, and that the Commissioner's finding clearly reflected not only his awareness and understanding of terminology commonly used within the rate regulatory field, but also his acceptance of the testimony concerning the propriety of including potential benefits from frequency regulations and voltage regulation as factors in determining rates to be charged petitioners.

The Commissioner expressly found that "the user receives a more stable power supply." Frequency regulation and voltage control are clearly significant components of a stable power supply and we think that the Commissioner's language, although sparse, sufficiently indicates his intention to accept the testimony that such benefits were provided. Under the test set down in *Valley* and in *Bekins,* this finding of fact is

sufficient to advise this court of the facts found to be true.

## II. Crown Zellerbach Corporation v. Davis

This plaintiff, Crown Zellerbach Corporation (Crown), places principal reliance upon the admitted fact that prior to the filing of Pacific's new proposed rate schedule it had entered into a separate rate contract with Pacific to supply its mill at Camas, Washington, with electric power.

Indeed, since 1911 Crown has purchased and paid for electricity from Pacific and its predecessors under a series of contracts, setting various rates and conditions. At the time the Commissioner's order here challenged was entered, the parties were operating under a contract executed in 1965 and renewed in 1971, as modified by written amendments of March 31, 1970, April 8, 1970, and February 12, 1971. The contract expired on April 1, 1976, more than two years after Pacific filed its proposed tariff revision on December 27, 1973. We note that Crown here seeks a refund of the amount paid by it in excess of the contract price. The matter is therefore not rendered moot by the expiration of the contract.

Pacific's December 27, 1973, filing proposed to apply its projected Schedule 32 (Portland Large General Service) rates to service at Crown's Camas mill. The Commissioner's order adopted Pacific's proposal. No other customer was served by Pacific at Schedule 32 rates. Pursuant to the Commissioner's order, Pacific's other large industrial customers were placed on Schedule 48, a rate schedule substantially more costly than Schedule 32. If the Commissioner had accepted the staff's proposal to place Crown on Schedule 48, Crown's rates would have increased far more than they did.

Crown contends its rates are fixed irrevocably by the private contract with Pacific, and that Crown has a

[ 220 ]

constitutional right to continue to purchase electricity at the contract price, which is far below cost.

Pacific and the Commissioner contend that the Commissioner has authority to order just and reasonable rates for Crown, just as the Commissioner does for all users, and that Crown cannot limit this rate-making authority by private contract. We note the Pacific-Crown contract did not attempt to so limit the Commissioner's authority.

The rates being challenged were not merely the product of a unilateral filing by Pacific. Pacific did file revised tariffs as required under ORS 757.205, designed to implement a general revenue increase. However, before these tariffs could go into effect, the Commissioner, acting under the authority of ORS 757.215, suspended them and instituted an investigation into their propriety and reasonableness. The Commissioner then held hearings, as provided by ORS 757.210, to determine whether the proposed rates were just and reasonable. Plaintiff Crown was a party to the hearings and presented evidence supporting the rate structure it argued should be applied to it.

Then, following the hearing, the Commissioner ordered that Pacific serve Crown at the rates he found appropriate. The Commissioner could have disapproved or modified the proposed tariff if he had found different rates to be reasonable. ORS 757.210, 757.215. Furthermore, even if Pacific had requested that no change be made to Crown's rates, the Commissioner had authority to investigate Crown's rates on his own motion as a part of the proceeding and alter the rates if he found them to be unreasonable. ORS 756.515. In the area of rate-making, the Commissioner possesses the broadest authority:

> "* * * The Commissioner appears, therefore, to have been granted the broadest authority—commensurate with that of the legislature itself—for the exercise of his regulatory function." *Pacific N.W. Bell v. Sabin,* 21 Or App 200, 214, 534 P2d 984, Sup Ct *review denied* (1975).

Indeed the Commissioner's regulations specifically require that rate schedules appearing in private contracts be treated identically with all other rate schedules.[1]

Thus in 1965, when Crown's present contract first became effective, and in 1971, when the parties revised Crown's contract, the rates and conditions of service established therein became Pacific's filed and published tariff schedules, fully subject to the Commissioner's regulatory authority. Therefore, we conclude the Commissioner acted within his authority when he raised Crown's rates to a level he found to be reasonable.

Crown contends that the power of the Commissioner to change rates or other conditions memorialized in a written contract between a public utility and one of its customers constitutes an impairment of the contract rights, and as such is in violation of Article 1, § 10 of the United States Constitution.

We disagree. In *Midland Co. v. K.C. Power Co.,* 300 US 109, 57 S Ct 345, 81 L Ed 540 (1937), the court said:

> "* * * [T]he State has power to annul and supersede rates previously established by contract between utilities and their customers. It has power to require service at nondiscriminatory rates, to prohibit service at rates too low to yield the cost rightly attributable to it, and to require utilities to publish their rates and to adhere to them. * * *" (Footnotes omitted.) 300 US at 113.

---

[1] Oregon Administrative Rules, ch 860, § 22-035:

"(1) Public Utilities within the state entering into special contracts with certain customers prescribing and providing rates, services and practices not covered by or permitted in the general tariffs, schedules and rules filed by such utilities are in legal effect tariffs and are subject to supervision, regulation and control as such.

"(2) All special agreements designating service to be furnished at rates other than those shown in tariffs now on file in the Commissioner's office shall be classified as rate schedules. A true and certified copy shall be filed subject to review and approval pursuant to requirements of Rules 22-005 to 22-030, inclusive."

Furthermore, were such an argument upheld, then the whole public interest in utility regulation would become meaningless, since by making separate contracts with all or any of its individual customers, the utility and the customer could effectively bypass all or any relevant part of the public utility regulatory statutes and the regulations governing the public utility.

Crown urges that we apply the so-called Mobile-Sierra doctrine.[2] That doctrine, as we understand it, and the cases relied upon by Crown, relate to contracts between utilities, each of whom in turn retails its product to the ultimate consumer. The doctrine does not purport to restrict the right of the regulatory agency to control the rates charged and other protections by law afforded to the ultimate consumer. As such it is not properly applicable here. Accordingly we do not find it necessary to consider here whether the doctrine applies in an appropriate case of contracts between two or more regulated public utilities.

Because the contract had endured in one related form or another for so many years, it has been suggested that the Commissioner is in effect estopped to effect the change in rate required under the challenged order.

In *Pacific N.W. Bell v. Sabin, supra,* we considered at length the question of the effect on the Commissioner's authority of either his prior approval of a contract under ORS 757.495, or of his prior approval of a utility's annual budget under ORS 757.105. There we said:

> "* * * Does the Commissioner's prior approval of a contract between a utility and an affiliated interest (ORS 757.495) or of the utility's annual budgets which include payments under that contract (ORS 757.105) 'estop' him from disallowing any portion of those pay-

---

[2] *See: United Gas Co. v. Mobile Gas Corp.,* 350 US 332, 76 S Ct 373, 100 L Ed 373 (1956), and *F.P.C. v. Sierra Pacific Power Co.,* 350 US 348, 76 S Ct 368, 100 L Ed 388 (1956).

ments when exercising his authority to determine and impose 'just and reasonable' rates?

"As noted at the outset, rate making is a legislative function, and those upon whom responsibility for the exercise of that function is conferred are endowed with a broad discretion. Professor Davis has pointed out that:

> " '* * * For an equity court to hold a case so as to take such further action as evolving facts may require is familiar judicial practice, and administrative agencies necessarily are empowered to do likewise. When the purpose is one of regulatory action, as distinguished from merely applying law or policy to past facts, an agency must at all times be free to take such steps as may be proper in the circumstances, irrespective of its past decisions. * * * Even when conditions remain the same, the administrative understanding of those conditions may change, and the agency must be free to act. * * *' (Footnotes omitted.) 2 Davis, Administrative Law Treatise 605, 610, § 18.09 (1958).

Because applying a doctrine of 'estoppel' to the acts of the Public Utility Commissioner would deprive him of an essential flexibility and appear to be inconsistent with his regulatory role, we do not believe that either ORS 757.495 or 757.105 should—in the absence of clear language to the contrary—be interpreted as giving rise to such a limitation." 21 Or App at 225-26.

We conclude that the Commissioner had not only the right, but indeed the duty, in exercising his authority to set just and reasonable rates, to consider and, upon a proper showing, to change the Crown-Pacific contract with respect to the rate to be charged thereunder.

■ Lastly, Crown contends that the record lacks substantial evidence to support the findings upon the basis of which the change was ordered. Although there was a large amount of conflicting evidence offered, consistent both with our limited scope of review and the deference due to the expertise of the Commissioner, we conclude that there was substantial evidence to support the finding and the challenged rate change.

## III. City of Portland v. Davis

Both Pacific and Portland General Electric Company (PGE) serve the Portland area. Past competition between the utilities as a result of previous action by the Commissioners had been used to justify authorizing Pacific to set its Area P rates at parity with PGE's. The consequence was that the rates in Area P, defined as "all territory served by [Pacific] in Multnomah County" were lower than the rates in Area A, defined as all territory served by Pacific in Oregon except that territory included in "Area P" and the territory within and immediately adjacent to the corporate limits of the cities of The Dalles and Springfield.

The PUC staff proposed that the rate differentials between the Area P and Area A rates be eliminated. This proposal was opposed by both Pacific and the City of Portland, which appeared as an intervenor-protestant on behalf of itself as a municipal corporation and in a representative capacity for all Portland citizens receiving Pacific's service.

The Commissioner found and concluded that:

"The rates in Area P (Portland) are generally lower than in Area A. A rate differential between Area P and Area A was formerly justified on the basis of competing electric service in Area P between Pacific and Portland General Electric. For various reasons, it was believed that in the Portland metropolitan area rates between two similar utilities serving the same area should be the same.

*"The two companies no longer competitively serve the same areas. Their respective areas of service within Portland have been defined. Thus, with the lack of competition, the justification for rate uniformity is said to have disappeared.*

"Pacific and The City of Portland defend the continuing rate disparity between Area P and Area A. They state without the benefit of any cost studies that lower rates are justified in Portland because it is cheaper to serve a more densely populated area than a less densely populated area where users are more widely scattered.

Some credence can be given to this argument. With increasing costs being experienced primarily in generation and transmission because of the shift from hydro to thermal generation, distribution has become a relatively less significant element in total cost of service. Consequently, cost of service differentials based upon the density of users (if they do exist) will continue to narrow.

"The law prohibits discrimination among customers of the same class under similar circumstances. *There is no finding that the differences between service to Portland area customers and to other areas of the state justify continued rate disparities. The Area P rates will be discontinued and the Area A rates made applicable in Area P. However, the company may elect to maintain parity of its rates with those of Portland General Electric, but only insofar as the imputed revenue decrease is borne by the shareholders rather than by Pacific's other customers.*" (Emphasis supplied.)

On appeal the City contends that this portion of the order is not supported by substantial evidence in the record. It argues that all findings and conclusions made by the Commissioner justifying his elimination of the Area P rate were predicated upon the single assertion by PUC staff witness White that Pacific and PGE had exchanged *service* territories within Portland; that this assertion was erroneous because a previous order No. 72-870 (1972), had approved an exchange of *facilities,* not of service territories; and that therefore all findings, conclusions and orders predicated on it must be set aside. The City further asserts that the Commissioner ignored evidence controverting his conclusions that service areas had been defined and that competition no longer existed within Portland.

Pacific does not appeal this portion of the order, but does contend that competition may potentially exist within Portland if there is a disparity between Pacific's and PGE's rates.

We note initially that the order does not prevent Pacific from charging Area P customers rates equal to

PGE's Portland rates. What the order does require is that if Pacific elects to do so, then the imputed revenue decrease must be borne by the shareholders rather than by Pacific's other customers. This is consistent with 24 Op Att'y Gen 245 (1949).

It is the duty of the Commissioner to protect "customers, and the public generally, from unjust and unreasonable exactions and practices and to obtain for them adequate service at fair and reasonable rates." ORS 756.040(1). Unjust discrimination in rates is expressly forbidden by statute:

> "(1) * * * [N]o public utility * * * shall, directly or indirectly, by any device, charge * * * any person a greater or less compensation for any service rendered or to be rendered by it than:
> "* * * * *
> "(b) It charges * * * any other person for a like and contemporaneous service under substantially similar circumstances.
> "* * * * *." ORS 757.320.

And

> "No public utility shall make or give undue or unreasonable preference or advantage to any particular person or locality, or shall subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect." ORS 757.325(1).

Vice President Davenport of Pacific testified at the hearing. When asked repeatedly whether Portland was still a competitive area, he was unable to answer categorically either way. He pointed out that there is little physical duplication between Pacific and PGE, but that because their franchises *permit* each to service any Portland customer, disparate rates *could* engender competitive pressure upon them. His answers allow a reasonable mind to infer that not enough actual or potential competition exists between Pacific and PGE to warrant equal rates at the expense of higher rates by Area A customers to subsidize it.

We conclude that substantial evidence exists in the

record, aside from witness White's alleged misstatement of fact, to support the Commissioner's finding that competition between Pacific and PGE no longer exists, or, if any does, it is not sufficient to support maintenance of the separate Area A and Area P rates. We do not find it necessary, therefore, to consider or decide whether the previous rate differentials between Area A and Area P rates were authorized under ORS 757.310 and 757.325

Furthermore, we conclude that even if competition did exist, the Commissioner has the power under ORS 756.040(1), 757.310(1)(b) and 757.325(1) to determine, as he has done here, that the competitive situation, actual or potential, in Portland does not warrant rate discrimination to the detriment of non-Portland customers.

Accordingly, we affirm this portion of the order.

### IV. E. D. Oliver v. Sabin

Oliver appeared before the Commissioner in propria persona as an eastern Oregon residential customer of Pacific, and represents only himself in this appeal.

Oliver argues, first, that the Commissioner erred in refusing to order a study of the cost of service to the various rate classes, and that such a study would confirm Oliver's contention that the new rates allowed by the order discriminate against residential customers in favor of industrial and utility customers. Indeed, Oliver argues that without a cost study equitable rate analysis is impossible.

As we discussed above, it is within the Commissioner's discretion to choose between alternative *methods* of allocating rates among classes of customers. Actual cost of service and LRIC are only two of the possible alternatives. The Commissioner's duty is to see that rates are just and reasonable. It is for him to determine the nature and type of facts he believes are the

most likely to aid him in performing that duty. Furthermore, in addition to the duty placed on the utility under ORS 757.210, it is the purpose of the hearing to allow one who challenges a rate change to present such facts as in his opinion warrants or requires a particular result. This burden is not transferred to the Commissioner merely because the challenger objects to the proposed rate. The Commissioner may, as he did here, order such studies as he deems relevant, but he is not required to have any particular study or investigation made. See *Pacific N. W. Bell v. Sabin,* supra.

■ We conclude that the order as it relates to residential rates is lawful and supported by substantial evidence.

■ Oliver also contends that the cost of Pacific's advertising program directed at energy conservation should not have been allowed by the order as a ratepayer expense because it is not in the best interests of the residential customer. There was substantial evidence enabling the Commissioner to find that energy conservation is in the public interest, and that Pacific's expenditures for such advertising are not unreasonable. We note that other regulatory bodies which have considered this issue have allowed conservation advertising expenses. *See Re the Gas Service Co.,* 6 Pub U Rep (PUR) 4th 99, 105 (Mo 1974); *Wash Util. & Transp. Comm. v. Pacific Power & L. Co.,* 7 Pub U Rep (PUR) 4th 470, 488 (Wash 1974); *Re Wisconsin Power & Light Co.,* Pub U Rep (PUR) 4th 305, 308 (Wis 1974).

Accordingly, the decrees of the circuit court in each case are affirmed.