*[609]
 
 LEE, J.
 

 Petitioner appeals from the trial court’s order affirming the decision of the Public Utility Commissioner (Commissioner) as to the legality of several aspects of petitioner’s relationship with Pacific Northwest Bell (PNB).
 

 Petitioner operates a public land mobile radio service, and is licensed by the Federal Communications Commission (FCC) as a miscellaneous common carrier.
 
 [1]
 
 The subscribers to petitioner’s service communicate by radio with petitioner’s base stations, which in turn afford the subscribers access to PNB’s telephone landlines. Thus petitioner’s subscribers are able to communicate via petitioner’s base stations with PNB’s customers, and vice versa.
 

 In 1970, petitioner signed an interconnection agreement
 
 [2]
 
 with PNB. In that agreement, PNB agreed to provide the landline facilities which petitioner desired to use in the operation of his service. Since 1970, however, petitioner has refused to sign a new agreement, and, since 1972, PNB has refused to provide additional facilities to petitioner unless petitioner signs such an agreement.
 

 In 1974, petitioner filed a complaint against PNB with the Commissioner. The complaint requested an investigation of PNB’s rate schedule (or tariff) then in effect, and in particular, a ruling by the Commissioner
 
 *[610]
 
 as to the legality of Paragraph J of PNB’s tariff. Paragraph J provides:
 

 "Radiotelephone service systems provided by Miscellaneous Common Carriers may be connected with the exchange and message toll network of the Company. Such connections will be made by means of Company furnished connecting equipment designed specifically for Miscellaneous Common Carrier applications or with connecting arrangements used for similar connections of customer-provided communications systems, if suitable. H= * *
 

 "All such connections of Miscellaneous Common Carrier provided radiotelephone systems shall be made under and in accordance with the provisions of agreements made by and between the Miscellaneous Common Carrier and the Company.”
 

 Petitioner alleged that by virtue of Paragraph J, PNB was allowed to subvert state and federal tariffs, impose extra-tariff restrictions, and control petitioner’s method of doing business by refusing to provide services until petitioner signed an interconnection agreement. Petitioner also alleged that it was discriminated against in that through Paragraph J, PNB compels it to sign agreements which no other class of subscriber must sign as a precondition to receiving service,
 
 see;
 
 ORS 757.245
 
 [3]
 
 and 757.325,
 
 [4]
 
 and that the provisions of Paragraph J are overly broad and allow PNB to impose unreasonable conditions.
 
 See,
 
 ORS
 
 *[611]
 
 757.020.
 
 [5]
 
 Petitioner requested that Paragraph J be stricken from PNB’s tariff, and that PNB be ordered to interconnect with petitioner on the "same basis as any other class of subscriber.” PNB filed a cross-complaint alleging that petitioner had assisted its customers in making interexchange toll calls which avoided the intrastate and interstate toll charges established by PNB’s tariff.
 

 After a lengthy hearing, the Commissioner ruled in favor of PNB both on the complaint and cross-complaint, and held that PNB was allowed to require petitioner to account for all interexchange intrastate toll charges for all calls handled by petitioner since July 30, 1971. If petitioner refused to make such an accounting, the Commissioner’s order allows PNB to terminate service to petitioner. Petitioner then brought suit in circuit court pursuant to ORS 756.580(1)
 
 [6]
 
 to set aside the Commissioner’s order. In August, 1976, the court denied the requested relief and affirmed the Commissioner’s order.
 

 I
 

 Petitioner contends that the court and the Commissioner incorrectly determined that Paragraph J satisfies the requirements of ORS 757.205, which provides in part:
 

 "(1) Every public utility shall file with the commissioner, within a time to be fixed by him, schedules which shall be open to the public inspection, showing all rates, tolls and charges which it has established and which are
 
 *[612]
 
 in force at the time for any service performed by it within the state, or for any service in connection therewith or performed by any public utility controlled or operated by it.
 

 "(2) Every public utility shall file with and as part of every such schedule all rules and regulations that in any manner affect the rates charged or to be charged for any service. * * *”
 

 Petitioner contends that neither Paragraph J nor any other portion of PNB’s tariff contains the rate provisions or the conditions contained in the interconnection agreement which PNB is now requiring it to sign as a precondition to receiving service, and that consequently PNB’s tariff does not contain
 
 "all
 
 rates, tolls and charges” or "allrules and regulations.” (Emphasis added.)
 

 In order to resolve this issue, it is necessary to review the functions and purposes of tariffs. An analysis of the statutory scheme shows that once filed with the Commissioner, tariffs take effect either immediately or on a particular date specified in the tariff.
 
 See,
 
 ORS 757.205
 
 etseq.
 
 Whenever a new tariff is filed, or when the rates in an existing tariff are changed, the Commissioner may, either upon written complaint from a member of the public or at his own initiative, conduct an investigation and a hearing to determine the propriety and reasonableness of the tariff. ORS 757.210. The Commissioner is empowered to suspend the operation of the tariff for a maximum period of nine months during his investigation, ORS 757.215(1), and the utility bears the burden of establishing that the tariff is reasonable. ORS 757.210.
 
 See, Pacific N. W. Bell v. Sabin,
 
 21 Or App 200, 204, 534 P2d 984, Sup Ct
 
 review denied
 
 (1975). The Commissioner’s authority to prescribe revisions of tariffs is a legislative function,
 
 see, American Can Co. v. Davis,
 
 28 Or App 207, 559 P2d 898, Sup Ct
 
 review denied
 
 (1977), and he "is not obligated to employ any single formula or combination of formulas to determine what are in each case 'just and reasonable rates.’ ”
 
 Pacific
 
 
 *[613]
 

 N W. Bell v. Sabin, supra
 
 at 224. Before an existing tariff may be changed, a copy of the new tariff must be open for public inspection thirty days prior to the effective date of the tariff in every business office of the utility, ORS 757.240(2), and no tariff may be changed without thirty days notice to the Commissioner. ORS 757.220. All existing schedules must also be available for "convenient” public inspection both at the office of the Commissioner, ORS 757.205(1), and at every business office of the utility, ORS 757.240(1).
 

 It becomes apparent from this statutory scheme that the requirement that tariffs showing "all rates, tolls and charges” and "all rules and regulations” be filed with the Commissioner serves two distinct purposes. The first is the function of formality; the nature and effect of tariffs require that they be instituted in a procedurally regular manner, and the filing requirement provides such procedures. The second purpose, and one of paramount importance, is in keeping with the regulatory role of the Commissioner. If the Commissioner is to fulfill his statutory duty of representing the customers "of any public utility * * * and the public generally in all controversies respecting rates * * *,” ORS 756.040(1), he must have the opportunity to gather the views of the public on rate matters. This opportunity is provided by the public filing and inspection provisions of ORS 757.205(1), 757.220, and 757.240(1) and (2).
 

 Here it is undisputed that the rates and conditions under which PNB is willing to provide service to petitioner are not contained in any tariff on file with the Commissioner. The Commissioner argues that interconnection agreements such as that contemplated by Paragraph J are "special contracts,” which are separately regulated by the Commissioner’s Rule 860-21-035(1), which provides:
 

 "Public utilities within the state entering into special ' contract with certain customers prescribing and providing rates, services and practices not covered by or permitted in the general tariffs, schedules and rules
 
 *[614]
 
 filed by such utilities
 
 are in legal effect tariffs and are subject to supervision, regulation and control as such.”
 
 (Emphasis supplied.)
 

 Even if we were to assume that the Commissioner is empowered to modify ORS 757.205(1) by regulation we find nothing in OAR 860-21-035(1) which supports the Commissioner’s position that special contracts are not subject to the filing requirements of ORS 757.205(1). OAR 860-21-035(1) specifically states that such contracts "are in legal effect tariffs and are subject to supervision, regulation and control as such.” Thus, under the terms of the regulation itself, special contracts must be treated as tariffs, and are subject to the same filing requirements as tariffs.
 

 Further, we can find no reason why special contracts should not be subject to the same filing requirements as tariffs. The agreement here establishes rules and conditions for the provision of service. The Commissioner’s interest and that of the public in the legality and reasonableness of the provisions of a special contract thus seems identical to those same interests regarding tariffs. Additionally, since the provisions of a special contract can have immediate and substantial effect, the procedural safeguards with which the Commissioner is empowered by ORS 757.210 and ORS 757.215 regarding the implementation of tariffs would be just as appropriately used with regard to special contracts.
 

 Petitioner makes an additional argument, however, that the FCC’s regulation of miscellaneous common carriers providing mobile carrier service is so pervasive as to deprive the Commissioner of any jurisdiction over petitioner, and, consequently, over the terms of the interconnection agreement. Under the Supremacy Clause of the United States Constitution, Article VI, clause 2, the federal constitution and laws are the supreme laws of the land. State laws which are concerned with areas of federal regulation run afoul of the Supremacy Clause if any one of the following three
 
 *[615]
 
 tests is met: (1) Congress intended to preempt state regulation in the area,
 
 Rice v. Santa Fe Elevator Corp.,
 
 331 US 218, 67 S Ct 1146, 91 L Ed 1447 (1947); (2) the state and federal laws or regulations irreconcilably conflict,
 
 Kelly v. Washington,
 
 302 US 1, 58 S Ct 87, 82 L Ed 3 (1937); or (3) there is inherent in the area regulated a need for national uniformity,
 
 City of Burbank v. Lockheed Air Terminal,
 
 411 US 624, 93 S Ct 1854, 36 L Ed 2d 547 (1973). As the Supreme Court noted in
 
 Florida Avocado Growers v. Paul,
 
 373 US 132, 83 S Ct 1210, 10 L Ed 2d 248 (1963), the test for preemption is strict:
 

 "The principle to be derived from our decision is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons — either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.” 373 US at 142.
 

 The first question which must be answered, then, is whether Congress, through the enactment of the Federal Communications Act, 47 USC §151
 
 et seq.,
 
 intended to preempt any state regulation of mobile common carriers such as petitioner. 47 USC §221(b) is directly on point:
 

 "Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire,
 
 mobile,
 
 or point-to-point radio telephone exchange service, or any combination thereof, even though a portion of such exchange service constitutes interstate or foreign communication, in any case where such matters are subject to regulation by State commission or by local governmental authority.” (Emphasis supplied.)
 

 47 USC §221(b) is a clear statement that Congress did not intend to preempt state regulation of mobile common carriers through the passage of the Federal Communications Act.
 
 Radio Telephone Commun., Inc. v. Southeastern Tel. Co.,
 
 170 So 2d 577 (Fla 1965);
 
 ATS
 
 
 *[616]
 

 Mobile Tel. v. Curtin Call Comm., Inc.,
 
 232 NW2d 248 (Neb 1975);
 
 In re Curtin Call Communications, Inc.,
 
 FCC No. 76-1107 (1976).
 
 See also, Souris River Telephone Mutual Aid Corp.,
 
 28 FCC 275 (1960);
 
 Jordaphone Corporation of America et al.,
 
 18 FCC 644 (1954).
 
 [7]
 

 The second question which must be resolved as to preemption is whether there exists any federal statute, rule, or decision which would conflict with the Commissioner’s assertion of jurisdiction over the interconnection agreement. Petitioner relies solely on
 
 Telerent Leasing Corp.,
 
 45 FCC2d 204 (1974),
 
 aff’d sub nom, North Carolina Util. Com’n v. F.C.C.,
 
 537 F2d 787 (4th Cir),
 
 cert denied,
 
 429 US 1027 (1976), as support for its claim that such conflicting law exists.
 

 In
 
 Telerent,
 
 several manufacturers and distributors of communications equipment petitioned the FCC to rule that state utility regulatory agencies are preempted from restricting in any manner inconsistent with FCC decisions or rules the interconnection of customer-provided terminal equipment to the customer’s individual subscriber station and line.
 
 [8]
 
 In
 
 Telerent,
 
 the FCC ruled that:
 

 «* * * jf
 
 each
 
 State were to be free to establish its own rules governing interconnection for the purposes of
 
 *[617]
 
 intrastate services, uniform nondiscriminatory interstate service throughout the country would be rendered difficult if not impossible. Because of the indivisibility of the network, it is impossible, from a practical economic and operating standpoint, for a common carrier to comply with conflicting Federal and State regulation. Moreover, if a State were to bar interconnection of customer-provided equipment for intrastate service in derogation of a Federal rule, the carrier would be placed in an untenable position of having to violate either the State ruling or the Federal ruling * * *.
 

 "For all of the foregoing reasons, this Commission has primacy in authority over the terms and conditions governing the interconnection of customer-provided equipment to the nationwide telephone network.” 45 FCC2d at 219-20.
 

 We fail to see how the FCC’s
 
 Telerent
 
 decision poses a direct conflict to the Commissioner’s assertion of jurisdiction over the interconnection agreement here.
 
 Telerent
 
 was concerned with the interconnection of
 
 customer-provided terminal equipment,
 
 and with state regulation which severely limited such interconnection in the face of a conflicting FCC policy. Here even petitioner does not claim that the Commissioner is regulating the permitted uses of customer-provided terminal equipment. Rather the Commissioner is regulating the conditions of an agreement between a mobile carrier and a telephone company — an agreement which involves interconnection of the facilities of each but which does not involve customer-provided terminal equipment. We can find no federal statute, rule, or decision which poses a direct conflict with the
 
 *[618]
 
 Commissioner’s assertion of jurisdiction over the interconnection agreement.
 

 The final preemption test is whether the inherent nature of the subject matter regulated requires national uniformity, and, consequently, a prevailing federal rule. Petitioner once again relies heavily on
 
 Telerent Leasing Corp., supra,
 
 and on the decision in the appeal, from the FCC’s order in that case,
 
 North Carolina Util. Com’n v. F.C.C.,
 
 537 F2d 787 (4th Cir),
 
 cert denied,
 
 429 US 1027 (1976).
 

 The policy statement of the Federal Communications Act states that the FCC was created
 

 "[flor the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide * * * service with adequate facilities at reasonable charges * * * ” 47 USC § 151.
 

 Though 47 USC §151 does point to a need for national uniformity, several other provisions of the Federal Communications Act recognize the need for and propriety of state regulation of the intrastate activities of carriers.
 
 See,
 
 47 USC §202(b) (FCC has no jurisdiction with respect to facilities, or regulations for or in connection with intrastate communication service of any carrier); 47 USC §221(b) (FCC has no jurisdiction over wire,, mobile or point-to-point radiotelephone exchange service where such matters are subject to regulation by a state utility commission). Also, many decisions of the FCC and federal and state courts recognize that the Federal Communications Act sought to preserve and foster state regulation of intrastate communication.
 
 See, People of California et al. v. FCC et al.,
 
 Civil No. 75-2060, 567 F2d 84 (1977),
 
 cert den,
 
 — US-(1978). (No. 77-406);
 
 Southwestern Bell Telephone Co. v. United States,
 
 45 F Supp 403 (WD Mo 1942);
 
 TV Pix, Inc. v. Taylor,
 
 304 F Supp 459 (D Nev)
 
 aff’d
 
 396 US 556, 90 S Ct 749, 24 L Ed 2d 746 (1970);
 
 Radio Telephone Commun., Inc. v. Southeastern Tel. Co., supra; ATS Mobile Tel. v. Curtin Call Comm., Inc., supra; Souris River Telephone Mutual
 
 
 *[619]
 

 Aid Corp., supra; Jordaphone Corporation of America et al., supra.
 

 We conclude that the delicate balance struck by the Federal Communications Act between federal and state regulation of communication matters forbids a conclusion that the need for national uniformity in the regulation of mobile common carriers preempts the Commissioner from asserting jurisdiction over the interconnection agreement. Congress explicitly recognized the dual regulatory scheme it was creating in the communications area, and implicit in that recognition is the notion that the states are encouraged to formulate regulatory schemes for intrastate communications consistent with and in addition to the Federal Communications Act and FCC rules and decisions. We do not read the
 
 Telerent
 
 decisions as commanding a different result. The
 
 Telerent
 
 decisions were concerned with inconsistent state regulation of matters over which the FCC had expressly assumed jurisdiction and had determined that the need for national uniformity required a single federal rule. The FCC has made no such determination with respect to mobile common carriers. To the contrary, the FCC has recently ruled that states are not preempted from asserting regulatory jurisdiction over mobile common carriers such as petitioner.
 
 See, In re Curtin Call Communications, Inc.,
 
 FCC No 76-1107 (1976).
 

 The Commissioner, then, is not preempted from asserting jurisdiction over the interconnection agreement. Consequently, we conclude that the interconnection agreement proposed by PNB is subject to the filing requirements of ORS 757.205(1), and that the court and Commissioner erred in holding otherwise. Thus, when PNB files the interconnection agreement with the Commissioner, the Commissioner will have the opportunity to review the agreement to determine its lawfulness. The Commissioner, however, contends that the agreement covers only matters of intrastate communication, and that thus the agreement must be
 
 *[620]
 
 read only in the light of applicable state law. Much of what we have already said serves to answer this contention. Since the interconnection agreement will determine the ability of petitioner’s subscribers to gain access to the interstate as well as intrastate landline telephone network, it is clear that interstate communication is involved in the interconnection agreement.
 
 See, People of California et al. v. FCC et al., supra; North Carolina Util. Com’n v. F.C.C., supra.
 
 Thus, when determining the legality of the interconnection agreement, the Commissioner must refer to applicable federal standards and must insure that the agreement does not run afoul of any federal statute, rule or decision.
 

 II
 

 Because two of petitioner’s remaining assignments of error concern the legality of the proposed interconnection agreement, we do not reach those issues, for it may develop that the Commissioner will reject or modify the interconnection agreement. Petitioner’s fourth assignment of error, however, does not expressly deal with the interconnection agreement, and thus may be resolved in this appeal.
 

 Regarding PNB’s cross-claim, petitioner mounts a number of challenges to the Commissioner’s finding of fact No. 15, which states:
 

 "As a second use, [petitioner] utilizes.the McMinnville FEX [foreign exchange line] circuit to permit Portland mobile subscribers to call a McMinnville landline subscriber. The call travels from the Portland mobile to the Portland transmitter-receiver to the control point in Portland via the Portland RTOC [radio transmitter operating circuit] and will then be connected to the McMinnville FEX circuit which provides access to the General Telephone McMinnville central office in McMinnville and to the McMinnville landline subscriber. [Petitioner] does not consider this a toll call, although if completed solely over landline facilities, toll charges apply to calls between Portland and McMinnville. [Petitioner] thus gives its Portland subscribers toll-free access to the McMinnville landline exchange over
 
 *[621]
 
 an RTOC circuit which was provided for facility control purposes, but which [petitioner] actually uses to provide a service similar to foreign exchange service to its mobile customers in order to avoid tolls. Also, [petitioner] will terminate a mobile subscriber’s call originating in the reliable service area of the McMinnville transmitter-receiver in the Portland landline exchange. The call is transmitted from a McMinnville location via an RTOC to [petitioner’s] Portland control point, then over an exchange access facility circuit into the Portland central office of PNB and on to a Portland landline subscriber. Again, such a call would require payment of toll charges if completed solely over the landline telephone facilities of PNB and General Telephone. [Petitioner] does not consider such a call a toll call and does not collect toll charges from its customers when the call is completed.”
 

 At the heart of petitioner’s contention is 47 CFR §21.513, which provides:
 

 "Within the service area encompassed by the field strength contours of each base station as defined in § 21.504, there shall be at least one message center so located that the major portion of subscribers’ local exchange landline telephone calls, which originate or terminate in such area in conjunction with messages transmitted or received by said station, cost no more per call than the local message single unit rate. In cases where the control point of a base station is not so located, a public foreign exchange telephone circuit shall be provided to afford service so that a radio service subscriber may communicate between such points at a cost per call not in excess of the local message single unit rate.”
 

 The purpose of 47 CFR §21.513 is to insure that subscribers to a mobile common carrier service such as petitioner’s will not be required to pay interexchange toll charges to make intraexchange or local calls simply because the control point
 
 [9]
 
 of the carrier is located outside of the local call area and the call must
 
 *[622]
 
 physically cross the boundaries of a telephone exchange area.
 

 Here, petitioner’s control point is located in Portland, though many of petitioner’s subscribers are in the McMinnville area. Calls originating with petitioner’s mobile subscribers in the McMinnville area which are made to McMinnville landline customers are transmitted from the subscribers’ automobiles to a radio receiver in McMinnville. The radio receiver is operated by remote control by petitioner from Portland through the use of a radio transmitter operating circuit (RTOC), a form of telephone landline. The call is then transmitted over the RTOC to petitioner’s control point in Portland. There the call is switched to a McMinnville foreign exchange line (FEX) which petitioner has leased from PNB for a fixed sum to satisfy the requirements of 47 CFR §21.513. The call is then completed via the FEX to the McMinnville landline number without the imposition of interexchange toll charges. The following is a simplified drawing representing the way petitioner complies with 47 CFR §21.513.
 

 
 *[623]
 
 a
 

 <c
 

 ac
 

 o
 

 CL.
 

 a <c ac
 
 o
 
 CL. Receiver
 

 
 *[624]
 
 The Commissioner’s finding No. 15 describes two additional uses which petitioner makes of the circuits and lines required of it by 47 CFR §21.513. First, the Commissioner found that petitioner allows its Portland mobile subscribers toll-free access to the McMinnville FEX. As described by the Commissioner, calls from petitioner’s mobile subscribers intended for McMinnville landline numbers are received by a radio receiver in Portland and are then transmitted to petitioner’s Portland control point over an RTOC. Petitioner then switches the call to the McMinnville FEX, and the call is completed to the McMinnville landline number. Thus, petitioner’s Portland subscribers are able to make calls to McMinnville without the imposition of any interexchange toll charges. The following is a simplified drawing of this practice as described by the Commissioner.
 

 
 *[625]
 

 
 *[626]
 
 The second use which the Commissioner found to be employed by petitioner arises when a McMinnville subscriber of petitioner makes a call to a Portland landline number. The call travels the McMinnville transmitter over the RTOC to petitioner’s Portland control point where, the Commissioner found, petitioner switches the call to a local Portland line. In this manner, petitioner’s McMinnville customers are able to make Portland calls without the imposition of interexchange toll charges. The following is a simplified drawing of this practice as described by the Commissioner. The Commissioner found that both of the above uses constituted evasion of toll charges.
 

 
 *[627]
 
 PNB Landline Customers 3 b- CO LU CO —■ z o b- < LU LU
 
 od cd
 
 O-l— (=) <c
 
 ad CD
 
 Q_ LU O
 

 
 *[628]
 
 Petitioner’s first contention is that finding No. 15 is contradictory, in that "first the Commissioner states Autofone connects the transmitter and a McMinnville FEX; then he says Autofone gives toll-free access over an RTOC.” Though finding No. 15 is inartfully worded in this regard, it is clear that the Commissioner was simply referring to two separate steps in the same process; when a Portland subscriber makes a call to a McMinnville landline number, the call first travels over an RTOC and then over an FEX. Thus, finding No. 15 is not contradictory.
 

 Petitioner next contends that, even assuming the facts as set forth in Finding No. 15 are true, it has not been aiding its subscribers in evading toll charges as the Commissioner found.
 
 [10]
 
 Petitioner argues that the Commissioner’s conclusion is based on the assumption that Portland and McMinnville are "two separate service areas,” a conclusion which petitioner contends is contrary to the following language in the Commissioner’s opinion:
 

 "* * * [PNB] is currently providing facilities to the [petitioner] which enable him to obtain remote control of his operation while complying with FCC requirements regarding the placement of message centers and toll-free calling within the reliable service area of each base station.
 
 It is not within the power of the Commissioner to impose a definition of the FCC term hose station’*
 
 * (Emphasis supplied.)
 

 Petitioner’s argument seems to confuse the term "telephone exchange service area” with "base station.” The phrase "base station” is used by the FCC to describe "a land station in the land mobile service carrying on a service with land mobile stations.” 47 CFR §21.2. The Commissioner correctly concluded that the location of the base stations of a mobile carrier such as petitioner has no relevance in determining whether, through use of telephone landlines,
 
 *[629]
 
 the mobile carrier is evading toll charges imposed when the landlines cross
 
 telephone
 
 exchange boundaries.
 

 Petitioner next contends that under federal law it is allowed to engage in precisely the practices the Commissioner ruled constituted toll evasion. As we have noted
 
 supra,
 
 if such preemption has occurred then it is beyond the powers of the Commissioner to proscribe actions allowed under federal law.
 

 We can find no federal statute, rule, or decision which supports petitioner’s claim that it is allowed to engage in the practice the Commissioner termed toll evasion. Petitioner points only to 47 CFR §21.513, which is set out on page 16,
 
 supra.
 
 While it is true that 47 CFR §21.513 does contemplate limited resale of PNB’s services in that the regulation foresees the use of landlines in a mobile common carrier’s operation, by its terms the regulation applies only to local calls — not interexchange calls such as those involved here. There is no indication in the regulation that the resale of service in a manner resulting in the avoidance of interexchange telephone tolls is sanctioned.
 
 [11]
 
 Finally, we note that in
 
 In re American Telephone and Telegraph Co.,
 
 FCC No. 77-550 (1977), the FCC rejected similar contentions made by petitioner with respect to interstate toll charges saying:
 

 "We interpret the general purpose of 47 C.F.R. §21.513 to be that the majority of landline telephone
 
 *[630]
 
 calls transmitted by a [Radio Common Carrier], within the RCC’s reliable service area, are to be rated as local exchange, rather than toll calls. To accomplish this purpose, we require the RCC to find a point within the local telephone exchange in which to place its message center such that the major portion of landline calls within its reliable service area are rated as exchange calls. However, if the message center is not so located, we require the RCC to procure [an FEX] to that local exchange so that most calls within its service contour can continue to be rated as local exchange calls. Section 21.513 does not, as Autofone suggests, entitle an RCC’s subscriber to access a local exchange beyond the RCC’s authorized service area at non-toll rates. * * *”
 

 Reversed in part; affirmed in part.
 

 [1]
 

 Miscellaneous common carriers are:
 

 "Communications common carriers which are not engaged in the business of providing either a public landline message telephone service or public message telegraph service.” 47 CFR § 21.2
 

 A communication common carrier is "any person engaged in rendering communication service for hire to the public.”
 
 Id.
 

 [2]
 

 Interconnection is the linkup between the facilities of a telephone company and the facilities of another carrier or person. As used in the setting presented by this case, interconnection describes the process whereby a subscriber to petitioner’s service may communicate directly with, and be reached by, all persons on the general telephone network.
 
 See generally, Radio Com. Car., Etc. v. New York State, Etc.,
 
 79 Misc 2d 600, 360 NYS2d 552 (Sup Ct 1974).
 

 [3]
 

 OES 757.245(1) provides:
 

 "(1) A public utility may establish reasonable through service and joint rates and classifications with other public utilities. Public utilities establishing joint rates shall establish just and reasonable regulations and practices in connection therewith and just, reasonable and equitable divisions thereof as between the public utilities participating therein, which shall not unduly prefer or prejudice any of such participating public utilities, and every unjust and unreasonable rate, classification, regulation, practice and division is prohibited.”
 

 [4]
 

 OBS 757.325(1) provides:
 

 "(1) No public utility shall make or give undue or unreasonable preference or advantage to any particular person or locality, or shall subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect.”
 

 [5]
 

 ORS 757.020 provides:
 

 "Every public utility is required to furnish adequate and safe service, equipment and facilities, and the charges made by any public utility for any service rendered or to be rendered in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited.”
 

 [6]
 

 ORS 756.580(1) provides:
 

 "(1) A party to any proceeding before the commissioner, when aggrieved by any findings of fact, conclusions of law or order, including the dismissal of any complaint or application by the commissioner, may prosecute a suit against the commissioner to modify, vacate or set aside such findings of fact, conclusions of law or order.”
 

 [7]
 

 A
 
 further indication that Congress did not intend to preempt state regulation of mobile common carriers may be found in 47 USC § 152(b), which provides:
 

 "Subject to the provisions of section 301 of this title, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier * *
 

 See also, North Carolina Util. Com’n v. F.C.C.,
 
 537 F2d 787 (4th Cir 1976),
 
 cert denied
 
 429 US 1027 (1976).
 

 [8]
 

 The
 
 Telerent
 
 decision was the culmination of several years of legal battles between the manufacturers of telephone equipment and the major telephone companies. In
 
 Re Carterfone,
 
 13 FCC2d 420,
 
 aff’d
 
 14 FCC2d 571 (1968), the FCC ruled that telephone companies could not refuse to interconnect a customer-provided mobile radio-telephone device. After
 
 Carterfone,
 
 the telephone companies took two tacks to limit interconnection of customer-provided equipment. The first was to require an AT&T
 
 *[617]
 
 provided "interface” device designed to protect the telephone system from f aulty equipment — a requirement the FCC originally sanctioned but which has recently been eliminated.
 
 See,
 
 Proposals for New or Revised Classes of Interstate and Foreign Message Toll Te. Serv. (MTS) and
 
 Wide Area Tel. Serv. (WATS),
 
 56 FCC2d 593, 598-99 (1975),
 
 modified
 
 58 FCC2d 736 (1976). The second tack was to seek prohibition of interconnection of such devices by state utility regulatory agencies, an approach which culminated in the
 
 Telerent
 
 decision.
 
 See generally,
 
 Note, Competition in the Telephone Equipment Industry: Beyond
 
 Telerent,
 
 86 Yale LJ 538 (1977).
 

 [9]
 

 A "control point” is:
 

 "* * * an operating position at which an operator responsible for the operation of the transmitter is stationed and which is under the control and supervision of the licensee.” 47 CFR §21.2
 

 [10]
 

 Though petitioner couches this argument in substantial evidence terms, his attack is actually pointed to the Commissioner’s legal conclusion that petitioner’s activities constituted an evasion of toll charges.
 

 [11]
 

 It seems likely that the allowance of the practices in question here would run afoul of the prohibition against discrimination commanded by 47 USC §202(a), which provides:
 

 "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.”
 

 If petitioner’s subscribers were allowed to continue making calls between McMinnville and Portland without paying toll charges, then PNB’s landline customers would pay more for such calls than would petitioner’s subscribers, whose calls also use PNB landlines.